RANDOLPH, Justice,
for the Court:
¶ 1. The issue as presented to this Court is whether the Circuit Court of Madison County erred in granting summary judgment for the Mississippi Insurance Guaranty Association (“MIGA”), and in denying a cross-motion for summary judgment for nursing homes and nursing-home residents. The circuit court found that MIGA was entitled to a credit, which would reduce the amount MIGA must pay to indemnify nursing-home owners and operators for damage claims of two nursing-home residents that were allegedly caused by a series of negligent acts and omissions over the course of many years.
¶ 2. We find that the factual and legal predicates necessary to formulate an opinion on coverage issues are lacking, which would preclude any court from rendering a valid ruling on coverage. We can discern no legal obligation giving rise to a duty for MIGA to indemnify the nursing homes, based on what was presented to the trial court. A decision on the subject matter of this declaratory judgment action — whether MIGA is entitled to a credit to reduce such obligation — cannot be adjudicated in the absence of proof of a legal obligation to pay. Therefore, we reverse the judgment of the Circuit Court of Madison County granting MIGA’s motion for summary judgment and denying Lane’s and Montgomery’s cross-motion for summary judgment, and remand the case to the circuit court to enter orders denying both summary-judgment motions, consistent with this opinion.
FACTS
¶ 3. Two suits underlie this case: (1) the Estate of Roberta Lane filed an action in the Circuit Court of Sharkey County globally alleging negligent conduct from 1989 to 1998 (“the Lane case”); and (2) the Conservator for Eva Montgomery filed an action in the Circuit Court of Adams County globally alleging negligent conduct from June 1998 to July 2003 (“the Montgomery case”). The cases were filed against companies that own and operate the nursing homes where Lane and Montgomery resided, nursing-home administrators, and related unnamed persons (collectively, “nursing-home defendants”).

The Nursing-Home Defendants’ Insurance Coverage

¶ 4. During the periods when Lane and Montgomery resided in the nursing homes, multiple insurance policies insured the facilities, "with no overlap of coverage periods in which the nursing homes were covered by more than one primary policy. The nursing homes’ insurance coverage was as follows:
8/1/92-8/1/95 St. Paul Fire & Marine Insurance
8/1/95-9/1/99 Reciprocal of America (“ROA”)
9/1/99-6/18/00 Caliber One Indemnity Co.
6/18/00-1/1/01 Colony Insurance Co.
1/1/01-6/18/02 Lloyd’s of London
ROA became insolvent in 2003.
¶ 5. The ROA policy included a liability limit for each “medical incident” in excess *1032 of the cap for MIGA’s obligation to pay-under an insolvent policy. See Miss.Code Ann. § 88 — 23—115(1)(a)(iii) (Rev.2011) (limiting MIGA’s obligation to $300,000 per claim). The ROA policy provided that ROA:
will pay on behalf of the Insured all sums which the Insured shall be legally obligated to pay as damages because of injury to which this policy applies arising out of a Medical Incident, occurring during the Policy Period.
(Italics added). The policy defines “Medical Incident” as:
any act or omission:
1. in the furnishing of professional health care services including the' furnishing of food, beverages, medications, or appliances in connection with such services and the postmortem handling of human bodies, or
2. arising out of service by an Insured as a member of a formal accreditation, standards of review, or similar professional board or committee of the Named Insured or as an Insured charged with executing the directives of such board or committee.
3. Failure to comply with any right of a health care facility resident under any state law regulating the Named Insured’s business as a resident health care facility;
4. Failure to comply with any right of a resident as included in the United States Department of Heath and Human Services regulation governing participating of intermediate care facilities and skilled nursing facilities regardless of whether the Named Insured’s business is subject to such regulations; and
5.Any professional services performed by a beautician or barber working for the Named Insured but this COVERAGE does not apply to any person while engaged in the business or occupation of a beautician or barber.
Any such act or omission, together with all related acts or omissions in furnishing of such services to any one person shall be considered one Medical Incident.
The ROA policy further provided that the “policy does not apply ... to liability assumed by the Named Insured under any contract or agreement.”

The Lane and Montgomery Cases

¶ 6. Lane was a resident at Heritage Manor of Rolling Fork nursing home from 1989 to 1998. Her residency overlapped the coverage periods of the ROA and St. Paul policies.[1] Montgomery was a resident at Adams County Nursing Center from June 1993 to July 2003. Her residency bridged the ROA policy period and the coverage of all four other insurers.
¶ 7. The complaints in the underlying cases alleged that Lane and Montgomery were injured as a result of continuous and uninterrupted abuse and negligence while they were residents at the nursing homes. Neither complaint specified separate, independent, negligent acts and/or omissions that caused specific damages. Rather, the complaints alleged that the nursing-home defendants were negligent in the overall care and treatment of Lane and Montgomery, by breaching various duties of care, *1033 such as “to provide adequate and appropriate custodial care and supervision[;]” “to exercise reasonable care in providing care and services in a safe and beneficial manner[;]” “to deliver care and services that a reasonably careful person would have provided under similar circumstances by failing to prevent mistreatment, abuse and neglect....” Both complaints summarily alleged that “[a]s a direct and proximate result of the negligence of [the nursing-home defendants,]” Lane and Montgomery “suffered injuries including [certain listed injuries].”
¶ 8. The Amended Complaint filed by the Estate of Roberta Lane alleged that the nursing-home defendants “breached [then] duty” to “exercise reasonable care in providing care and services in a safe and beneficial manner” for Lane when she was a resident at Heritage Manor. Inter alia, the Lane complaint alleged that:
As a consequence thereof, ROBERTA LANE suffered catastrophic injuries, disfigurement, extreme pain, suffering and mental anguish. The scope of severity of the recurrent wrongs inflicted upon ROBERTA LANE while under the care of the facility accelerated the deterioration of her health and physical condition beyond that caused by the normal aging process and resulted in physical and emotional trauma which includes, but is not limited to:
a) pneumonia;
b) multiple falls;
c) consistently elevated blood glucose;
d) episodes of low blood sugar;
e) multiple pressure sores;
f) urinary tract infections;
g) ear infection;
h) symptomatic hyperglycemia;
i) fracture of 5th right finger;
j) fracture of left hip;
k) weight loss; and
1)anemia.
(Emphasis added.)
¶ 9. The Complaint filed by Georgia Smith, as Conservator for Eva Montgomery, alleged that the nursing-home defendants “breached [their] duty” to “exercise reasonable care in providing care and services in a safe and beneficial manner” for Montgomery “throughout [Montgomery’s] sta/’ at Adams County Nursing Center, inter alia, and that:
[a]s a consequence thereof, EVA MONTGOMERY suffered catastrophic injuries, disfigurement, extreme pain, suffering and mental anguish. The scope and severity of the recurrent wrongs inflicted upon EVA MONTGOMERY while under the care of the facility accelerated the deterioration of her health and physical condition ... and resulted in physical and emotional trauma which includes, but is not limited to:
a) malnutrition;
b) dehydration;
c) multiple falls;
d) urinary tract infections;
e) body rashes;
f) multiple bruises and skin tears;
g) lacerations requiring stitches;
h) fecal impactions with related complications;
i) upper respiratory infections;
j) poor hygiene;
k) contractures;
l) multiple pressure sores; and
m) loss of weight.
(Emphasis added.) The Montgomery complaint further alleged that “[t]he wrongs ... were of a continuing nature, and occurred throughout EVA MONTGOMERY’S stay at [the nursing-home defendants’] facility.” (Emphasis added.)
*1034 ¶ 10. Discovery responses in both cases identified some alleged acts and omissions with specific dates, but Lane’s Estate and Montgomery’s Conservator did not abandon the language of the complaints claiming ongoing wrongful conduct throughout their stays. In response to an interrogatory, Lane’s Estate identified various dates of acts, omissions, and claimed injuries, but also reaffirmed acts and omissions that were continuous and uninterrupted, e.g., “[t]he incidents described in the Complaint were ongoing throughout Ms. Lane’s residency at [the nursing-home defendants’] facility and therefore each and every instance cannot be determined.” (Emphasis added.) In response to an interrogatory asking Montgomery’s Conservator to “state the factual basis for and itemize the amounts of all damages” sought, Montgomery’s Conservator identified various dates of acts, omissions, and claimed injuries. Montgomery’s Conservator also reverted to the continuous and uninterrupted language, e.g., “[t]he injuries sustained by Eva Montgomery were ongoing throughout her residency, so the Plaintiff is unable ... to name each and every instance of negligence.” (Emphasis added.) Thus, Lane’s Estate and Montgomery’s Conservator never abandoned their claims of ongoing wrongful conduct throughout the women’s residencies.
¶ 11. In 2006, the nursing-home defendants entered into separate settlement agreements with Lane’s Estate and with Montgomery’s Conservator, to which the solvent insurers were parties. MIGA was not a party to either settlement agreement. Under each settlement agreement, the solvent insurers agreed to pay all but $300,000 of the total settlement amount. The nursing-home defendants settled the Lane case for a total of $750,000, and the solvent insurers agreed to pay $450,000 in exchange for the Estate’s agreement to drop all claims, excepting the ROA coverage period. The Montgomery case settled for $1,300,000, with the solvent insurers agreeing to pay $1,000,000 in exchange for the Conservator’s agreement to drop all claims, excepting the ROA coverage period.
¶ 12. Both settlement agreements state that “the settlement value of any and all claims, causes of action and/or rights ... as a result of [i]ncidents that potentially implicate or otherwise fall within or arise under the ROA coverage period of the ROA Policies is at least $300,000.00.” Under each agreement, the nursing-home defendants would file a declaratory action to determine whether MIGA had a duty to pay the remaining $300,000, and if that effort was unsuccessful, no attempt would be made to execute on the property and assets of the nursing-home defendants, and the suit would be dismissed with prejudice.
ISSUES
¶ 13. The nursing-home defendants, Lane’s Estate, and Montgomery’s Conservator raised three issues on appeal:
1. Whether the Circuit Court erred in holding that MIGA is entitled to credit for payments by solvent insurers and in holding that MIGA is not required to indemnify the nursing-home defendants pursuant to Miss.Code Ann. § 83-23-123.
2. Whether the settled claims are not “covered claims” within the meaning of the Guaranty Act.
3. Whether there exists no solvent insurance for the injuries for which MIGA is obligated to pay.
¶ 14. MIGA formulates the issues slightly differently:
1. Whether this case involves a single “medical incident” and single “covered claim,” or whether there were separate occurrences and claims based on each *1035 incident occurring during the ten-year nursing home stay.
2. Whether MIGA is entitled to a credit under Miss.Code Ann. § 83-28-123(1) for payments to the claimant from solvent insurance policies covering the same continuing “medical incident.”
ANALYSIS
¶ 15. This case involves unresolved issues of fact and law, and, therefore, too much uncertainty remains for any ruling on the subject matter of this declaratory-judgment action. Mississippi Rule of Civil Procedure 57 provides that “[t]he court may refuse to render or enter a declaratory judgment where such judgment, if entered, would not terminate the uncertainty or controversy giving rise to the proceeding.” Miss. R. Civ. Proc. 57(a). Declaratory judgment would not terminate the uncertainty of this case, as no court has resolved the fundamental questions of the extent, cause, and time of Lane’s and Montgomery’s alleged damages; whether the nursing-home defendants have an obligation to pay; and, if the nursing homes are obligated to pay, for what portion MIGA is obligated to indemnify them.
¶ 16. MIGA’s obligation to indemnify the nursing-home defendants, up to its statutory limit, is determined by the insolvent insurer’s policy. See Miss.Code Ann. § 83—23—115(l)(b) (providing that MIGA “shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent”). MIGA could never have an obligation to indemnify under the insolvent insurer’s policy until the insured is legally obligated to pay. A legal obligation to pay under an insolvent insurers’ policy can arise in only two ways: (1) judgment is rendered holding the insured liable; or (2) the insurer (before insolvency) or MIGA (after the insurer becomes insolvent) enters into an agreement to indemnify the insured. We have reviewed the record and can find no existing legal obligation to pay. The nursing-home defendants’ voluntary settlement agreements in the Lane and Montgomery cases, without agreement by ROA or MIGA, do not confer a legal obligation to pay any amount. We find that the existence of an obligation is a sine qua non of MIGA being entitled to a credit, as it is impossible to determine whether MIGA is entitled to a credit to reduce a nonexistent obligation. In the absence of this essential element, ie., until a court renders judgment under which the nursing-home defendants must pay for covered damages suffered by Lane and Montgomery during the ROA policy period or MIGA enters into an agreement to indemnify the nursing-home defendants, the issues of whether this case involves one or more “covered claims” and whether MIGA is entitled to a credit are not ripe for adjudication.
¶ 17. The trial court erred in granting summary judgment on MIGA’s entitlement to a credit to reduce its obligation to pay, which has not been established. A declaratory judgment regarding credit, vel non, is not ripe for adjudication, until (1) MIGA has entered into an agreement to indemnify the nursing-home defendants for Lane’s and Montgomery’s alleged damages; or (2) a trial on the merits has determined: the extent, cause, and time of Lane’s and Montgomery’s damages; the extent of the nursing homes’ liability, if any; and the amount MIGA is obligated to indemnify the nursing homes under the ROA policy, if any.
¶ 18. Lane’s and Montgomery’s complaints alleged continuous, ongoing, wrongful conduct throughout their stays at the nursing homes. As Justice Kitchens noted at oral argument, the complaint pleaded a “seamless course of conduct,” and “this was pled the way it was, in the context of a continuing tort, for statute of limitations purposes.” However, once *1036 they settled their claims (with all but the insolvent ROA and MIGA), Lane and Montgomery attempted to jettison the seamless-course-of-negligent-conduct approach and adopted a contrary stance in their attempt to recover from MIGA. In them summary-judgment motion, and in this appeal, they now argue that their claims were for injuries that were “distinct, unrelated, and not part of the substantially same general harmful conditions,” creating a factual dispute that also precludes the granting of summary judgment.
CONCLUSION
¶ 19. The trial court erred in granting summary judgment, because the factual and legal predicates necessary to consider the grant or denial of summary judgment are not established in the record before this Court, which would preclude any court from rendering a valid ruling in this action. The underlying cases establish no legal obligation for which MIGA must indemnify the nursing-home defendants. Until a legal obligation has been established, the coverage issues raised in this action are not ripe. Therefore, we reverse the judgment of the Circuit Court of Madison County granting MIGA’s motion for summary judgment and denying Lane’s and Montgomery’s cross-motion for summary judgment, and remand the case to the circuit court to enter orders denying both summary-judgment motions for the reasons discussed herein.
¶ 20. REVERSED AND REMANDED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.

. The nursing-home defendants disputed the date of Lane’s admission into Heritage Man- or, asserting that she entered the nursing home in August 1994. The precise start date does not affect our analysis, as Lane’s residency at Heritage Manor overlapped the policies of St. Paul (8/1/92-8/1/95) and ROA (8/1/95-9/1/99) with a beginning date of either 1989 or 1994.